Samuel Guralnick and Jean Guralnick v. Commissioner. Samuel Guralnick v. Commissioner.
Guralnick v. Commissioner
Docket Nos. 43124, 43125.
United States Tax Court
T.C. Memo 1955-26; 1955 Tax Ct. Memo LEXIS 311; 14 T.C.M. (CCH) 90; T.C.M. (RIA) 55026; January 31, 1955
*311 Respondent determined that petitioners had failed to report in their respective returns for the years 1944 through 1950 the income earned by petitioner, Samuel Guralnick, from his slot machine business, and that such failure was due to fraudulent intent. Respondent also determined that petitioner, Samuel Guralnick, realized capital gains in the amount of $4,850 from the sale of his residential property in 1947. Penalties for substantial underestimate of estimated taxes were imposed. 1. Held, petitioner, Samuel Guralnick, received unreported income but incurred additional ordinary and necessary business expenses which were not taken into account by respondent in computing the deficiencies herein, and the deficiencies must be adjusted accordingly. 2. Held, further, the understatement of income in petitioners' returns was due to fraud with intent to evade the payment of taxes. 3. Held, further, in computing the capital gain realized on the sale of residential property, allowance is to be made for capital improvements made during the holding period and for a broker's commission. 4. Held, further, 6 per cent penalty under section 294(d)(2) for substantial underestimate of estimated *312 taxes is sustained. John P. Kichline, Esq., for the petitioners. John D. Armstrong, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income taxes and penalties determined against Samuel Guralnick and Jean Guralnick as follows: Year
Deficiency
50%
6%
Penalty
Penalty
Samuel Guralnick
1944
$6,586.44
$3,293.22
$395.43
1945
5,082.59
2,541.30
312.04
1946
4,732.21
2,366.11
290.96
1947
4,851.36
2,425.68
315.45
Samuel Guralnick and Jean Guralnick
1948
2,691.88
1,345.94
131.33
1949
6,165.18
3,082.59
434.44
1950
2,038.90
1,019.45
217.68
The issues to be decided are: (1) whether the net taxable income of Samuel Guralnick was understated in his income tax returns for the years 1944 to 1947, inclusive, and whether it was understated in the joint income tax returns of Samuel Guralnick and Jean Guralnick for the years 1948 to 1950, inclusive; (2) if so, are petitioners liable for the 50 per cent fraud penalty for such years as prescribed by section 293(b) of the Internal Revenue Code of 1939; (3) whether petitioner, Samuel *313 Guralnick, realized capital gains in 1947 in the amount of $4,850 from the sale of his residential property; and (4) whether petitioners are liable for the 6 per cent penalty for substantial underestimate of their estimated tax, as prescribed by section 294(d)(2) of the Internal Revenue Code of 1939, for each of the years 1944 to 1950, inclusive. Certain other issues raised by the pleadings were waived by petitioners. Findings of Fact Samuel Guralnick (hereinafter referred to as petitioner) and Jean Guralnick were husband and wife, residing in Philadelphia, Pennsylvania, during the years 1944 through 1950. Petitioner filed separate returns for the taxable years 1944 to 1947, inclusive, and he and his wife filed joint returns for the taxable years 1948 to 1950, inclusive. All such returns were filed with the collector of internal revenue for the first district of Pennsylvania. Petitioner was born in Poland in 1905 and entered the United States in 1923. His formal education was limited to 2 years of schooling in Poland and one year at night school in the United States. He was employed at various jobs during the years 1923 to 1938, including jobs in the hat trade, with a luggage *314 manufacturer, as an upholsterer, and in a meat market. In 1938, petitioner entered the amusement device business. He started this business in his after-work hours with pinball machines, then added music machines and, finally, slot machines. Petitioner operated 2 slot machines at a Moose Club in Philadelphia for a period sometime between 1938 and 1940 and then lost that location. He was subsequently requested by the Sgt. Yearsley Post, Veterans of Foreign Wars (hereinafter referred to as the Post), to place his slot machines at the Post. Petitioner entered into an arrangement with the Post and maintained slot machines there from 1940 until, approximately, September 1950. Petitioner was also engaged in a retail electrical appliance and musical supply business during the years here in issue, 1944 to 1950, inclusive. Under the terms of his agreement with the Post, the proceeds from the machines were equally divided between petitioner and the Post, after certain expenses were first deducted. The machines were generally emptied and the proceeds counted on Monday nights. When he emptied the machines, petitioner would take a handful of the coins and throw them on the bar to buy drinks *315 for the members. This would amount to anywhere from $5.00 to $15.00. Before the receipts were divided, the bartender would be reimbursed for "hits" which he had paid because the machine had failed to discharge the proper number of coins when a hit was scored. The sum of $15.00 was also given to local police officers each week before division of the receipts. This $15.00 was given to petitioner, who, in turn, would give it to the police officers. In addition, $20.00 was also taken out before the division of the proceeds and set aside for convention expenses for the Commander of the Post. The remaining coins were then wrapped in rolls and the rolls equally divided between petitioner and the Post. Any loose coins which remained were used to buy dinner for committee members or drinks for members at the bar. Petitioner maintained no books or records of the income and expenses attributable to this slot machine business. Respondent determined from records of the Post that, after the disbursement of the aforementioned sums from the common fund, petitioner and the Post each received the following aggregate amounts from the proceeds of the slot machines during the years here in issue: 1944
$14,158.00
1945
14,392.50
1946
13,338.00
1947
11,175.00
1948
12,558.00
1949
15,227.00
1950
13,884.50
*316 Petitioner incurred various expenses in connection with the operation of the slot machines at the Post. He spent $300 during each of the years 1944 through 1949 for stamp taxes on the machines, except for the year 1946 when he spent $200. In 1950 his expenditure for stamp taxes amounted to $400. He also purchased approximately 4 machines each year as replacements because of normal wear and tear, confiscation by the police, or theft. The machines were confiscated by the police 2 or 3 times during the 7 years here in issue and were also stolen once during this same period. The approximate cost of each machine was $225. Petitioner also paid approximately $150 per year for repair services and parts for the machines, except for 1950 when he paid $100. He performed most minor repairs himself and employed independent mechanics for the more difficult jobs. In 1944 petitioner bore the cost of building cubicles for the slot machines. This amounted to approximately $100. The Post moved to a new location in 1949 and petitioner again had cubicles constructed for the machines, at a cost of approximately $150. After the Post moved to its new location on July 29, 1949, petitioner paid $35 per *317 week for the salary of a doorman and also $10 per week for the services of a man who would provide change on weekends for persons playing the machines. This arrangement with the Post continued until the machines were removed from the Post during or about September 1950. Petitioner's associations and contacts with the Post were exclusively for business reasons. His frequent visits to the Post each week were occasioned by the need to repair the machines. Petitioner incurred various expenses to maintain the good will of the officers and members and to induce them not to replace his slot machines with those of a competitor. Each year he entertained both the old and new officers at separate dinners, at an approximate cost of $75.00 for each dinner. He furnished 2 cases of liquor, at an approximate cost of $45.00 each, to the delegates attending the state and national conventions each year. At Christmas time he gave gifts to various Post employees, officers, and committee members. These gifts were usually such articles as a bottle of liquor or a tie, and their total cost each year was approximately $100. Petitioner also paid approximately $100 in each of the years 1944 through 1949 for *318 professional entertainment and an amplification system at the Post's annual Armistice Day dinner. Petitioner frequently purchased drinks for various members of the Post who would be around the bar on occasions when he came in to repair or empty the machines. He did not necessarily know these members personally but treated them to drinks to maintain the good will of the Post. The approximate amount which he spent in this manner each of the years in issue, in addition to coins taken out of the back of the machines for this purpose, was $500, except that for 1950 such amount was $333. Petitioner also incurred various miscellaneous expenses amounting to approximately $100 during each of the years in question. These expenses included contributions to the financial support of various subsidiary organizations of the Post, such as the Ladies Auxiliary and the Drum and Bugle Corps. Also included in this amount are various cab fares and transportation expenses, donations of beer to members of the Post on election nights, and payments to members or their families who complained that the machines had failed to pay off or that they had lost their week's salary in the machines. Petitioner *319 reported the following amounts as his net income in his tax returns for the years 1944 to 1950, inclusive: Year
Net Income Reported
1944
* $ 3,553.79
1945
* 3,684.62
1946
5,038.67
1947
6,982.76
1948
4,986.45
1949
12,597.92
1950
14,334.51 He did not report any of the income from his slot machine business on his returns for these years. Although he kept no books or records, he knew that he was making a profit from the operation of the slot machines. A recapitulation of petitioner's gross income and expenses attributable to his slot machine business shows the following unreported income for the years 1944 to 1950, inclusive: 1944
1945
1946
1947
1948
Gross Income
$14,158.00
$14,392.50
$13,338.00
$11,175.00
$12,558.00
Less Expenses
Stamp Taxes
300.00
300.00
200.00
300.00
300.00
Replacement of
Machines
900.00
900.00
900.00
900.00
900.00
Repairs
150.00
150.00
150.00
150.00
150.00
Installation
100.00
Doorman and
Change Man
Officers' Dinners
150.00
150.00
150.00
150.00
150.00
Liquor for Conven-
tions
90.00
90.00
90.00
90.00
90.00
Christmas Gifts
100.00
100.00
100.00
100.00
100.00
Armistice Day En-
tertainment
100.00
100.00
100.00
100.00
100.00
Treats at Bar
500.00
500.00
500.00
500.00
500.00
Miscellaneous
100.00
100.00
100.00
100.00
100.00
Total Expenses
$ 2,490.00
$ 2,390.00
$ 2,290.00
$ 2,390.00
$ 2,390.00
Net Income
$11,668.00
$12,002.50
$11,048.00
$ 8,785.00
$10,168.00
*320 1949
1950
Gross Income
$15,227.00
$13,884.50
Less Expenses
Stamp Taxes
300.00
400.00
Replacement of
Machines
900.00
900.00
Repairs
150.00
100.00
Installation
150.00
Doorman and
Change Man
945.00
1,530.00
Officers' Dinners
150.00
150.00
Liquor for Conven-
tions
90.00
90.00
Christmas Gifts
100.00
Armistice Day En-
tertainment
100.00
Treats at Bar
500.00
333.00
Miscellaneous
100.00
100.00
Total Expenses
$ 3,485.00
$ 3,603.00
Net Income
$11,742.00
$10,281.50
Petitioner was aware that the operation of slot machines was illegal in the State of Pennsylvania. Petitioner was indicted in the United States District Court for the Eastern District of Pennsylvania on six counts for attempting to evade and defeat income taxes for each of the taxable years 1945 to 1950, inclusive. He plead nolo contendere to all counts and on October 23, 1952, received a sentence of imprisonment. Petitioner obtained statements from certain individuals, who were familiar with his activities at the Post, for submission to the Internal Revenue Service in connection with negotiations for settlement of these cases. The individuals signing these statements *321 did not swear to them before a Notary Public. After he obtained these statements, petitioner sent them to a Notary Public who affixed his seal to each statement. The statements were then presented to the Internal Revenue Service as being sworn statements. Petitioner purchased a residence in 1939 at a cost of $5,650. During the period he occupied it, he had the basement renovated and a recreation room constructed there at a cost of approximately $2,500. Petitioner sold his residence in 1947 for $10,500. During that same year, he subsequently paid $200 as a settlement of a $550 commission claimed by a real estate broker as being due him on the sale of the house. Petitioner failed to report any of the gains realized by him on the sale of his house. Respondent determined that such gains constituted long-term capital gains and were to be measured by the difference between the purchase price in 1939 and the selling price in 1947. Respondent made no allowance for expenditures for capital improvements or a broker's commission. Petitioners made payments on their declarations of estimated tax as follows: Year
Amount
1944
$ 321.00
1945
228.00
1946
480.00
1947
597.00
1948
1,042.00
1949
1,003.04
1950
1,000.00
*322 Petitioner failed to report the income derived from his slot machine business in the separate returns which he filed for the taxable years 1944 to 1947, inclusive, and in the returns which he filed jointly with his wife for the years 1948 to 1950, inclusive. Such returns were false and fraudulent and were filed with willful intent to evade the payment of taxes. Petitioner realized a long-term capital gain in the amount of $2,150 from the sale of his residence in 1947. Petitioner, Samuel Guralnick, substantially underestimated his declaration of estimated tax for each of the taxable years 1944 to 1947, inclusive. Petitioners, Samuel Guralnick and Jean Guralnick, substantially underestimated their declaration of estimated tax for each of the taxable years 1948 to 1950, inclusive. Opinion RICE, Judge: Petitioner concedes that the income derived from his slot machine business was not reported during the years in question. The points of controversy with respect to such income relate to the net amount actually received by him each year and whether the failure to report such amounts was due to fraud with intent to evade the payment of taxes. The gross income received by petitioner *323 each year from the operation of the slot machines has been determined by respondent on the basis of records maintained by the Post as to its 50 per cent share of the weekly proceeds. Petitioner raises no issue as to the accuracy of such records, or as to respondent's determination which discloses that the Post and, therefore, the petitioner as well, each received total annual amounts ranging from $11,175 to $15,227 during the 7 years in issue. However, petitioner contends that he should be allowed deductions for ordinary and necessary business expenses in amounts ranging from $10,041 to $14,068 during each of such years, thus reducing his unreported income to a small fraction of that determined by respondent. Petitioner maintained no books or records of his various expenditures. He has relied on his own testimony and that of various witnesses to substantiate the fact that these expenditures were made and the accuracy of his estimates as to their amount. We have carefully examined all the testimony and are convinced that, with respect to each item of claimed expenditure, some expenditure was, in fact, made and that such expenditure was an ordinary and necessary business expense. However, *324 petitioner's estimates appear to be grossly exaggerated, in most instances, as well as insufficiently corroborated. Petitioner must bear the burden of proof as to these expenses and, although a difficult one, his own failure to maintain adequate books and records has made it so. Bills and receipts must have been received and checks issued for many of these items, and yet no such evidence was introduced to substantiate the claimed expenditures. Petitioner's witnesses were of aid in establishing that various expenditures were made but, in almost every case, they were unable to substantiate petitioner's estimates of the amounts of such expenditures. Moreover, the credibility of petitioner's testimony as to such amounts was impeached by evidence that he submitted supposedly sworn statements of various individuals to respondent as a basis for negotiation when, in fact, such statements had not been sworn to. Notwithstanding the nebulous character of petitioner's evidence as to his business expenses, we are convinced that such expenses were in excess of the amounts which respondent has allowed him. Therefore, on the basis of the evidence before us and bearing heavily on the taxpayer in *325 view of the fact that his inexactitude is of his own making, we have incorporated the closest approximation possible of petitioner's actual expenditures into our findings of fact. Such amounts shall be allowed petitioner as deductions for ordinary and necessary business expenses for the years here in issue. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930). One additional item of income must be discussed; namely, the $15 taken from the common fund each week, before its division between petitioner and the Post, for payment to local police officers. Petitioner contends that such payments were made to compensate the police officers for maintaining order and preventing disturbances around the Post. Whether such payments were "protection" payments meant to frustrate a clearly defined public policy in Pennsylvania that the operation of lotteries is illegal and, consequently, not deductible as business expenses, we do not decide. See Charles A. Clark, 19 T.C. 48 (1952). If we assume the payments were made to policemen to maintain order and prevent disturbances around the Post (a duty incumbent on the police by virtue of their office), the payments are *326 still not deductible as they are not an ordinary and necessary business expense; and one-half thereof, which was attributable to petitioner's share from the common fund, must be added to his gross income. Petitioners contend that the 50 per cent penalties for fraud under section 293(b) should not be imposed because there was no intent to evade the payment of taxes. They admit that petitioner was aware that he derived taxable income from his slot machine business but argue that the only reason such income was not reported was for fear of revealing his illegal activities. This is a lame and untenable excuse since petitioner admits revealing these activities to the Federal Government when he personally paid the $100 stamp taxes on the machines on various occasions. We do not believe that petitioner failed to report his income from his slot machine business to the Federal Government because of fear of prosecution by local authorities. License taxes were paid to the Federal Government during each of the years in issue and this does not seem to have had any effect on the activities of the local police authorities. We are convinced that petitioner's failure to report this income was due *327 to a willful intent to evade the payment of taxes thereon. No books or records were maintained for the business, whereas petitioner seems to have kept a competent set of books for his retail appliance business. The income from his slot machine business during the period 1944 to 1950, inclusive, as determined herein, was larger than that from his appliance business. The consistent understatement of the income reported on their returns clearly evidences an intent to defraud, and the 50 per cent penalty under section 293(b) is, therefore, sustained. See Rogers v. Commissioner, 111 Fed. (2d) 987 (C.A. 6 1940). The next issue to be decided is the amount of capital gains realized by petitioner or the sale of his residence. Respondent determined that the difference between the purchase price of $5,650, paid by petitioner in 1939, and the $10,500, which he received for it in 1947, constituted capital gain. Petitioner contends that he made various capital improvements to the house, at a total cost of $3,395, during the time he occupied it and that these must be taken into account in computing his gain. He also contends that he paid $200 as a broker's commission on the sale of *328 the house and that this, too, must be deducted from his gain. Unfortunately, here also petitioner's testimony is obscure and unsubstantiated by bills or records. Among the items which he claims to have purchased and added to the house are venetian blinds, screens, a back porch and patio, a new and larger boiler, shrubbery, insulation, and a recreation room. Petitioner presented no evidence to corroborate his claims with respect to any of these items except the basement recreation room and the broker's commission. His testimony as to the other items is so vague and uncertain that we cannot find as a fact that such expenditures were made. We have allowed petitioner $2,500 as the cost of renovating his basement and constructing a recreation room there on the basis of the testimony of the contractor who did the work. Although respondent objects that a large portion of the amount paid for renovating the basement was for movable furniture and fixtures, this objection is met by a provision in the contract of sale whereby all such furniture and fixtures were transferred to the purchaser of the house. In addition, we are satisfied that $200 was paid as a broker's commission since the record *329 shows that petitioner was sued for a larger amount and he seems to have effected a settlement for $200. Therefore, these 2 items must be deducted in computing the gain realized by petitioner on the sale of his house. Respondent's determination of a 6 per cent penalty under section 294(d)(2) is sustained since, during each of the years in issue, petitioners' payments on their declarations of estimated tax were but a small fraction of their actual tax liability. Decisions will be entered under Rule 50. Footnotes
*. Adjusted Gross Income↩